Ned **PITTMAN, Plaintiff-Appellant,**

v.

**LARSON DISTRIBUTING COMPANY, a Colorado corporation; John L. Larson, Sr., and Robert G. Fitzsimmons, Defendants-Appellees.**

**No. 84CA0239.**

Colorado Court of Appeals, Div. I.

June 12, 1986.

Rehearing Denied July 10, 1986.

Certiorari Denied (Larson) Sept. 29, 1986.

Berger & Rothstein, P.C., David Berger, Commerce City, for plaintiff-appellant.

Towey & Zak, Edward B. Towey and Deborah A. Sperlak, Denver, for defendants-appellees.

KELLY, Judge.

Plaintiff, Ned Pittman, brought this action against the defendants, Larson Distributing Company (the company) and its employees, John Larson and Robert Fitzsimmons, seeking damages arising out of the termination of his employment contract. The defendants' motion for a directed verdict at the close of the plaintiff's case was granted and the action was dismissed. Pittman argues on appeal that there was sufficient evidence concerning his claims for breach of contract, wrongful discharge, fraud, conspiracy, and slander to submit the claims to the jury. We agree and reverse in part.

Pittman was hired by Robert Fitzsimmons, the carpet division manager of Larson Distributing Company, to work as a carpet salesman. Fitzsimmons agreed to give Pittman all accounts in a specified area of the Denver territory and to pay him 17% of gross profits on sales. Pittman testified that the employment was to be "permanent."

Pittman sold large volumes of merchandise and earned substantial commissions in the first ten months of his employment. At the beginning of the next fiscal year, the company, acting through Larson and Fitzsimmons, reduced Pittman's commission to 15%. There was evidence that the reason for the reduction in commission was that Larson was upset that Pittman earned more money than he did as owner of the company. Pittman protested the reduction, but continued to work. His earnings continued to increase. Beginning the third year, over Pittman's protest, his commission was again reduced, this time to a sliding rate, depending upon sales volume. Also, several of Pittman's accounts, including some he had developed himself, were given to other salesmen. These salesmen were paid 17% even though Pittman had been earning a lower commission on them.

After the second reduction in commission, Pittman consulted an attorney concerning his employment with the company, and a letter from Pittman's attorney was delivered to Fitzsimmons and Larson making demands for back payment of commissions and for restoration of territory. The letter concluded by requesting a response within five days, and stating that commencement of an action had been authorized if it should become necessary.

The company thereupon terminated Pittman's employment, and Pittman began looking for a new job in the same industry. In response to inquiries from a factory representative of a supplier to the company, Fitzsimmons stated that the reason Pittman had been terminated was because he "spent too much time in the office and on the telephone" rather than calling on customers. In response to inquiries from a customer, Fitzsimmons stated that Pittman had been terminated because he "wasn't doing as good a job."

The test applicable for determining the propriety of a directed verdict is stated in *Safeway Stores, Inc. v. Langdon,* 187 Colo. 425, 532 P.2d 337 (1975), quoting *Nettrour v. J.C. Penney Co.,* 146 Colo. 150, 360 P.2d 964 (1961), as follows:

" 'In passing upon a motion for a directed verdict the trial court [as well as an appellate court] must view the evidence in the light most favorable to the party against whom the motion is directed. Every reasonable inference to be drawn from the evidence presented is to be considered in the light most favorable to such party. A motion for directed verdict can only be granted where the evidence, when so considered, compels the conclusion that the minds of reasonable men could not be in disagreement and that no evidence, or legitimate inference arising therefrom, has been received or shown upon which a jury's verdict against the moving party could be sustained.' "

■ Moreover, a motion for a directed verdict in a jury trial admits the truth of the adversary's evidence and of every favorable inference of fact which may legitimately be drawn from it, *Salstrom v. Starke,* 670 P.2d 809 (Colo.App.1983). Once a plaintiff makes out a prima facie case, even though the facts are in dispute, it is for the jury, not the judge, to resolve the conflict. *Romero v. Denver & Rio Grande Western Ry. Co.,* 183 Colo. 32, 514 P.2d 626 (1973).

I

Pittman contends that the trial court erred in ruling that his employment contract with the company was terminable at will. He argues that his evidence made a prima facie case of permanent employment for jury consideration. We agree.

■ It is ordinarily for the jury to ascertain the meaning of "permanent" used in an oral employment contract in the light of all the circumstances surrounding the making of the agreement. *Lucacher v. Kerson,* 355 Pa. 79, 48 A.2d 857 (1946). Nevertheless, in the absence of special consideration or an express stipulation as to the duration of employment, a contract for permanent employment is no more than an indefinite general hiring terminable at the will of either party. *Lampe v. Presbyterian Medical Center,* 41 Colo.App. 465, 590 P.2d 513 (1978); *Justice v. Stanley Aviation Corp.,* 35 Colo.App. 1, 530 P.2d 984 (1974). Special consideration includes, among other circumstances, the acceptance by the employee of lower pay, and the employer's acquisition of the expertise and customer contacts of an experienced salesman. *Beeler v. H & R Block of Colorado, Inc.,* 487 P.2d 569 (Colo.App.1971) (not selected for official publication) (lower pay); *Fletcher v. Agar Mfg. Corp.,* 45 F.Supp. 650 (W.D.Mo.1942) (experience and customer contacts). *See also* Annot., 60 A.L.R.3d 226 at 264 (1974); 56 C.J.S. *Master & Servant* § 8.

■ Pittman testified that his oral contract was for "permanent" employment, that he took an initial cut in pay when he began work for the company, and that he brought to the company substantial customer contacts and experience. These circumstances could have been found by the jury to represent special consideration so that the employment was not terminable at will.

Apparently influenced by *Thacker v. American Foundry,* 78 Cal.App.2d 76, 177 P.2d 322 (1947), the trial court ruled that Pittman was required to prove that he had been "importuned, induced, or in any way persuaded" to leave his former employment and that he failed to do so. Without addressing the applicability of such a rule, we note that, if such a showing were required, there is ample evidence in the record to demonstrate inducement. Hence, there was sufficient evidence to show that the contract was not terminable at will and the issue should have been submitted to the jury.

II

Pittman next contends that the trial court erred in holding that, because the

contract was terminable at will, he had accepted by acquiescence the alterations by the defendants of the accounts and rate of commission. Because the question of the terminability at will of the contract must be submitted to the jury, the question of Pittman's acceptance of a new contract of employment must also be resolved by the jury.

▆▆▆▆ A contract for employment terminable at the will of either party may be supplanted by new terms of employment accepted by acquiescence. *Linder v. Midland Oil Refining Co.,* 96 Colo. 160, 40 P.2d 253 (1935). When the defense to an action by an employee for wages is that, subsequent to the hiring, the parties made a new contract with different terms, the burden of proving the new agreement rests upon the employer. *See Western Air Lines, Inc. v. Hollenbeck,* 124 Colo. 130, 235 P.2d 792 (1951); *Lyman v. Schwartz,* 13 Colo.App. 318, 57 P. 735 (1899).

As suggested by *Linder, supra,* whether the employee protested contract changes is an important factor in determining whether the employee has acquiesced in a new contract by continuing to work.

▆▆▆ Here, Pittman testified that he protested the changes in his commission and territory. This evidence tends to controvert the implication of consent raised by Pittman's continuing to work. Hence, the issue is for jury resolution in the event it finds the employment contract to be terminable at will.

Moreover, in addition to the evidence of Pittman's protests, there is evidence that he was coerced into continuing to work under the new contract terms. Pittman testified that, when he requested that Fitzsimmons restore his commissions, "I was told not to tell anyone and, however, if I did attempt to leave or go anywhere, he would black-list me down, and he would hurt me as much as he possibly could."

▆▆▆ The threat of blacklisting an employee in an industry is a form of coercion that constitutes duress as a matter of law, and formation of an employment contract

under such duress is ineffective. *See Mayerson v. Washington Manufacturing Co.,* 58 F.R.D. 377 (E.D.Pa.1972), citing Restatement of Contracts § 493 (1932). In Colorado, such blacklisting is a misdemeanor. *See* §§ 8–2–110 and 8–2–111, C.R.S. Accordingly, the jury could reasonably have found that coercion negated any inference of consent to a new contract raised by the fact that Pittman continued working.

The defendants argue that it is the custom of the industry to make changes in commission and territory without the consent of the employee and that this custom was incorporated in the original contract. According to the defendants, even in the light most favorable to Pittman, the evidence establishes the existence of this industry custom and, given the parties' silence on the issue, the custom was incorporated into the contract by operation of law. Thus, say the defendants, it is immaterial whether the contract was terminable at will. We disagree.

▆▆▆ Absent contrary provisions in the agreement, parties who contract on a subject matter concerning which known usages of an industry prevail incorporate these usages into their agreement by implication. *See M.R. Mansfield Realty, Inc. v. Sunshine,* 38 Colo.App. 334, 561 P.2d 342 (1976), *aff'd,* 195 Colo. 95, 575 P.2d 847 (1978); *W.C. Bradbury & Co. v. T.A. Butler & Son,* 1 Colo.App. 430, 29 P. 463 (1892). However, the existence of industry custom is a question of fact, *Sundance Development, Inc. v. Standard Lumber & Hardware Co.,* 520 P.2d 1056 (Colo.App. 1974) (not selected for official publication), and actions tending to demonstrate intent of the parties are proper considerations for the fact-finder. *Threadgill v. Peabody Coal Co.,* 34 Colo.App. 203, 526 P.2d 676 (1974). In this case, the evidence of industry custom relied on by the defendants is not so overwhelming as to establish the existence of such a custom as a matter of law.

▆▆▆▆ Moreover, before one can be bound by custom, he must know of it, or it

must be so universal and well established that he is presumed to have knowledge of its existence, and the parties must have contracted with reference thereto. *Lorraine Manufacturing Co. v. Allen Manufacturing Co.*, 77 Colo. 156, 234 P. 1055 (1925). Parties engaged in the same occupation are presumed to have knowledge of usages applicable to the industry, and it is not necessary in litigation between them to establish actual knowledge of usage. *Pletchas v. Von Poppenheim*, 148 Colo. 127, 365 P.2d 261 (1961).

■ Here, however, there may be a question of fact on retrial whether Pittman was engaged in the same industry so as to be bound by its customs. Pittman testified that, in his former employment, he sold hard flooring rather than carpeting, and there is no evidence in this record to show that the purported custom pertains to both types of employment. Under these circumstances, the issues should be presented to the jury if a fact question arises on retrial.

### III

Pittman next contends that the trial court erred in holding that, because the contract was terminable at will, Pittman had failed to establish a prima facie case of wrongful discharge. We agree.

■ If an employment contract does not have a definite term, the general rule is that it may be terminated at any time and for any cause without liability. *Justice v. Stanley Aviation Corp., supra.* However, where one is employed for a definite term and is discharged before the expiration of the term without fault on his part, a prima facie case of wrongful discharge is made out. *Saxonia Mining & Reduction Co. v. Cook*, 7 Colo. 569, 4 P. 1111 (1884).

Nevertheless, Pittman argues that, even if his contract was terminable at will, the evidence makes out a prima facie case for wrongful discharge under several exceptions to the general rule set out in *Justice.* Under the so-called "modern trend" in tort law, some exceptions have been established to the general rule that a contract without a definite term may be terminated at any time or for any cause. *See generally* J. Dooley, *Modern Tort Law* §§ 45.01–45.05 (1984 rev. ed.). Pittman urges the application of these several exceptions.

Pittman first claims that he was discharged in contravention of a statutorily conferred right or duty, namely, §§ 8–3–102(1)(c), 8–3–108(1)(a), 8–3–108(1)(*l*), 8–3–108(2)(a), and 8–4–110, C.R.S., which concern the right of an employee to enter a voluntary agreement, the prohibition of certain unfair labor practices, and the obligation of an employer to pay compensation due. This court held in *Lampe, supra,* that a "broad, general statement of policy contained in a statute" upon which the plaintiff there relied is inadequate to establish an exception to the employment at will doctrine. This rule was reaffirmed in *Corbin v. Sinclair Marketing, Inc.*, 684 P.2d 265 (Colo.App.1984) and these cases are dispositive here.

■ Pittman next contends that his discharge was in violation of personnel regulations in an employee manual. The failure of an employer to comply with the procedures set out in an employment manual must be pleaded as a breach of contract in order to establish a prima facie case for wrongful discharge. *Corbin, supra.* Moreover, the plaintiff must prove that he relied upon the personnel regulations at issue. *Salimi v. Farmers Insurance Group*, 684 P.2d 264 (Colo.App.1984). Pittman failed to fulfill either requirement.

■ Pittman next urges the court to extend the implied covenant of good faith and fair dealing, now found in some commercial contracts, *see, e.g.*, § 4–1–203, C.R.S., to employment contracts as well. We decline to do so.

In support of his position, Pittman cites *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977) which presents very different factual circumstances. Furthermore, there is substantial authority against the inclusion of such a covenant in employment contracts. *E.g., Daniel v. Magma Copper Co.*, 127 Ariz.

320, 620 P.2d 699 (Ct.App.1980), (*review denied*); *Criscione v. Sears, Roebuck & Co.*, 66 Ill.App. 664, 23 Ill.Dec. 455, 384 N.E.2d 91 (1978).

We have examined Pittman's remaining contentions supporting the application of an exception to the employment at will doctrine and find them to be without merit. Thus, as to all of the exceptions urged upon us, the trial court properly declined to submit the issues to the jury.

■ Should the jury find, however, that the contract was for permanent employment, Pittman's claim for wrongful discharge must be considered by the jury. Pittman introduced evidence tending to show that he was not discharged because of fault on his part, but rather in retaliation for his insistence upon being paid in accordance with the terms of his original contract. This evidence makes out a prima facie case of wrongful discharge under *Saxonia, supra.* Thus, if similar evidence is presented on retrial, the burden of proving that Pittman was discharged for cause will be on the defendants. *Reussow v. Eddington*, 483 F.Supp. 739 (D.Colo.1980). *See also Adams v. Frontier Airlines Federal Credit Union*, 691 P.2d 352 (Colo.App. 1984).

### IV

■ Pittman next contends that the trial court erred in holding that he failed to establish prima facie cases of statutory and common law fraud. We agree as to common law fraud only.

Section 8–2–104, C.R.S., makes it unlawful for any person to induce workmen to change from one place of employment to another by means of false or deceptive representations. Section 8–2–105, C.R.S., makes violation of § 8–2–104 a misdemeanor punishable by fine and imprisonment, and § 8–2–107 gives employees a private right of action for a violation of § 8–2–104.

Specifically, § 8–2–104, C.R.S., provides, in pertinent part:

"It is unlawful for any person [or] company ... to induce, influence, persuade,

or engage workmen to change from one place of employment to another in this state ... through or by means of false or deceptive representations, false advertising, or false pretenses...."

Section 8–2–106 further provides:

"Sections 8–2–104 to 8–2–107 shall be construed only to apply in cases where workmen are brought into this state, or induced to go from one place to another in this state by any false pretenses, false advertising, or deceptive representations...."

There is no evidence in this record to establish that Pittman was induced to change his employment and go from one place to another in this state. Hence, the statute is inapplicable to the facts before us.

■ The elements of common law fraud are:

"(1) A false representation of a material existing fact, or a representation as to a material existing fact made with a reckless disregard of its truth or falsity; or a concealment of a material existing fact, that in equity and good conscience should be disclosed. (2) Knowledge on the part of the one making the representation that it is false; or utter indifference to its truth or falsity; or knowledge that he is concealing a material fact that in equity and good conscience he should disclose. (3) Ignorance on the part of the one to whom representations are made or from whom such fact is concealed, or the falsity of the representation or of the existence of the fact concealed. (4) The representation or concealment made or practiced with the intention that it shall be acted upon. (5) Action on the representation or concealment resulting in damage."

*Morrison v. Goodspeed*, 100 Colo. 470, 68 P.2d 458 (1937).

When the record is examined in the light most favorable to Pittman, several potentially false representations are revealed. According to Pittman, Fitzsimmons represented to him that his employment would

be "permanent," that he would receive a 17% commission on gross sales, and that he would be given the former salesman's territory. We cannot say that, as a matter of law, these representations were not false.

In addition, there was evidence that these representations were made with knowledge of their falsity. Larson indicated that, at the time Pittman was told he would earn a 17% commission, his actual intent was to pay Pittman "a fair wage." Also, arguably, the other elements of fraud were present in that Pittman was not aware that Larson had anything in mind other than paying him a 17% commission permanently, the representations as to Pittman's remuneration were obviously intended to be acted upon, and Pittman did in fact change jobs in reliance thereon. Accordingly, reasonable persons could have disagreed as to whether Pittman proved his case for common law fraud, and a directed verdict should not have been granted.

### V

Pittman next contends that the trial court erred in holding that he failed to establish a prima facie case of slander. We agree.

██ In the context of this case, the elements of a cause of action for slander per se are: (1) an oral statement, (2) published to a third party, (3) which is defamatory of the plaintiff's trade, business, or profession, and (4) requires no extrinsic evidence to show how it might be taken as concerning the plaintiff or defaming him in his trade or business. *Bernstein v. Dun & Bradstreet, Inc.,* 149 Colo. 150, 368 P.2d 780 (1962); *Dorr v. C.B. Johnson, Inc.,* 660 P.2d 517 (Colo.App.1983). In an action by a private person plaintiff involving a statement which is not a matter of public interest or general concern, a claim for slander per se does not require proof of damages; they are presumed. *See Diversified Management, Inc. v. Denver Post, Inc.,* 653 P.2d 1103 (Colo.1982); *Rowe v. Metz,* 195 Colo. 424, 579 P.2d 83 (1978).

"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."

Restatement (Second) of Torts § 559, *quoted in Burns v. McGraw-Hill Broadcasting Co., Inc.,* 659 P.2d 1351 (Colo.1983).

"One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession ... is subject to liability without proof of special harm."

Restatement (Second) of Torts § 573, cited in *Dorr, supra. See also Paris v. Division of State Compensation Insurance Fund,* 517 P.2d 1353 (Colo.App.1973) (not selected for official publication), *cert. denied.*

██ The allegedly defamatory statements were: (a) the statement of Fitzsimmons that Pittman was fired because he "wasn't doing as good a job," and (b) the statement of Fitzsimmons that Pittman was fired because he "spent too much time in the office and on the telephone." The first statement was made to a customer of the company in response to his question. The second statement was made to a factory representative of a supplier to the company in response to his inquiries. These statements are clearly defamatory under the above definition, and the trial court should have held them to be slanderous per se as a matter of law. *See Paris, supra; Inter-State Detective Bureau, Inc. v. Denver Post, Inc.,* 29 Colo.App. 313, 484 P.2d 131 (1971). Each statement, as a separate publication, constitutes a distinct claim for relief. *Walker v. Associated Press,* 160 Colo. 361, 417 P.2d 486 (1966).

██ Defendants maintain, however, that even if the statements were defamatory, they must be held to be constitutionally protected opinion as a matter of law. We disagree.

In *Burns, supra,* our supreme court applied a three-part test to determine whether a given statement was constitutionally protected opinion:

"First, whether the statement complained of is 'cautiously phrased in terms of apparency.' ... Second, the entire published statement must be examined in context, not just the objectionable word or phrase. Third, all the circumstances surrounding the statement, including the medium through which it is disseminated and the audience to whom it is directed, should be considered."

Here, neither statement was cautiously phrased in terms of apparency. Rather, they were unqualified statements of fact. No other reasons were given or hinted at for Pittman's firing. As Pittman's supervisor, Fitzsimmons was in a position to know the real reasons for Pittman's firing. Finally, the statements were made to persons in the carpet industry from whom Pittman might seek future employment.

Applying the three-part test set forth in *Burns*, we conclude that Fitzsimmons' statements are not constitutionally protected opinion.

Defendants next argue that Larson established the affirmative defense of conditional privilege as a matter of law. We disagree.

■ Depending on the circumstances, if the publisher of defamatory information is promoting a legitimate individual, group, or public interest, he may communicate that information to another in good faith, notwithstanding that it is defamatory. *Ling v. Whittemore*, 140 Colo. 247, 343 P.2d 1048 (1959).

" 'A privileged communication is an exception to the rule that every defamatory publication implies *malice*. A qualified privilege is extended to a communication made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty either legal, moral or social, if made to a person having a corresponding interest or duty....' "

*Denver Public Warehouse Co. v. Holloway*, 34 Colo. 432, 83 P. 131 (1905) (emphasis in original).

"An occasion is conditionally privileged when the circumstances induce a correct or reasonable belief that

"(a) facts exist which affect a sufficiently important interest of the publisher and

"(b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest."

Restatement of Torts § 594.

Here, the *occasions* of the allegedly slanderous statements made by Fitzsimmons were privileged.

"Every one owes it as a duty to his fellowmen to state what he knows about a person, when inquiry is made; otherwise, whether or not men were honest could not be ascertained except by experience. But for such inquiries, it would often occur that parties about to enter into business relations with others would be unable to ascertain in advance their character with respect to integrity or capability. The interest of society demands and requires that inquiries may be made respecting such matters, and that answers thereto may be given without subjecting the party answering such inquiries to an action for libel or slander, for the opinion furnished in response to such inquiries; hence, where a party to whom an inquiry is addressed regarding another communicates *bona fide* without malice to the person making inquiry facts regarding the person inquired about, it is a privileged communication; and so it follows that a party is justified in giving his opinion in good faith of the integrity and standing of a tradesman in answer to an inquiry concerning him."

*Melcher v. Beeler*, 48 Colo. 233, 110 P. 181 (1910).

*See also Patane v. Broadmoor Hotel, Inc.*, 708 P.2d 473 (Colo.App.1985).

■ However, the "common interest" privilege is not absolute. *Abrahamsen v. Mountain States Telephone & Telegraph Co.*, 177 Colo. 422, 494 P.2d 1287 (1972). The person to whom such an inquiry is addressed cannot abuse his privilege in answering it, *Melcher v. Beeler, supra*, and it will be lost if the publisher is actuated by

express malice. As stated in *Abrahamsen v. Mountain States Telephone & Telegraph Co., supra:*

> "[T]he question whether in a particular case a publication is to be deemed privileged (that is, whether the situation of the party making it and the circumstances attending it were such as to rebut the legal inference of malice) is one of law to be determined by the court. However, the existence of malice, the question of good faith on the part of the defendants, and their honest belief in the truth of the statements put forth by them, all are matters of fact which are to be determined exclusively by the jury."

See also *CJI-Civ.2d* 22:16 (1980).

The burden of proving abuse of privilege is on the plaintiff. *Coopersmith v. Williams,* 171 Colo. 511, 468 P.2d 739 (1970). As with any question of fact, however, if the words, taken in connection with admitted facts, are such as must have been used honestly and in good faith by the defendant, the judge may withdraw the cause from a jury and direct a verdict for the defendant. *Ling v. Whittemore, supra.*

■ In this case, there was evidence that Fitzsimmons abused the privilege and, therefore, the cause should have been submitted to the jury. First, there is evidence that the statements were false, and that Pittman was fired not because of poor job performance or failure to make personal calls on customers, but because he demanded satisfaction of his claims for compensation. Although falsity alone would not support a finding of abuse of privilege, Fitzsimmons was in a position to know that the reasons given for firing Pittman were false, and was required to answer truthfully. *See Melcher v. Beeler, supra; CJI-Civ.2d* 22:16 (1980).

Pittman also testified that in 1978 Fitzsimmons threatened to blacklist him and purposefully discredit his reputation if he told anyone about the commission reductions or attempted to leave. Shortly before he was fired, Pittman was told that if he withdrew his demand letter and resigned, he would be given a good recommendation, but that if he refused to do so, he would not be given a good recommendation. This evidence of malice clearly presented the issue of abuse of privilege. Since abuse of privilege was subject to reasonable dispute, the issue should have been presented to the jury.

Defendants also argue that they established as a matter of law an absolute defense of substantial truth. We disagree.

■ The right to assert that an allegedly defamatory statement is true is a constitutional right and, if established to the satisfaction of the finder of fact, is an absolute defense to an action for defamation. *Gomba v. McLaughlin,* 180 Colo. 232, 504 P.2d 337 (1972); *CJI-Civ.2d* 22:5 (1980). "A defendant asserting truth as a defense in a libel action is not required to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting, of the matter is true." *Gomba, supra.*

As previously stated, the evidence was not so clear as to establish the truth of the statements as a matter of law. In light of the evidence of Pittman's outstanding sales performance, the real reasons for Pittman's firing are subject to dispute. Pittman's admission that he had previously been instructed to "get out of the office more" does not establish the substantial truth of the assertion that Pittman was fired because he "spent too much time in the office and on the telephone." Taking the evidence in the light most favorable to Pittman, the jury could reasonably have found that Fitzsimmons' stated reason was merely a post hoc justification for public consumption.

## VI

Pittman's final contention is that the trial court erred in holding that he had failed to establish a prima facie case of civil conspiracy. We agree.

> "To constitute a civil conspiracy there must be: (1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3)

a meeting of minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."

*McGlasson v. Barger,* 163 Colo. 438, 431 P.2d 778 (1967). *See generally* 15A C.J.S. *Conspiracy* §§ 1 through 6.

"The proof of a conspiracy in civil cases ... *determines who shall respond in damages.* Action of an individual which would cause him to be liable for damages, if acquiesced in by two or more others, and in which they co-operated, imposes on all who participated the obligation to respond in damages resulting from the consummation of the common design."

*Morrison v. Goodspeed, supra,* (emphasis added).

Here again, the trial court did not specify which element or elements of the conspiracy claim Pittman failed to prove. However, it appears that the missing element was the unlawful act or purpose. Our determination that Pittman established a prima facie case as to the claims for breach of contract, wrongful discharge, common law fraud, and slander requires reversal of the directed verdict on the conspiracy claim if Pittman proved the remaining elements of conspiracy.

■ The defendants contend, however, that even if the unlawful act requirement is fulfilled, an action for conspiracy would not lie because Pittman failed to prove the element of a combination of two or more persons. A corporation and its employees do not constitute the "two or more persons" required for a civil conspiracy, *Zelinger v. Uvalde Rock Asphalt Co.,* 316 F.2d 47 (10th Cir.1963) citing *Lockwood Grader Corp. v. Bockhaus,* 129 Colo. 339, 270 P.2d 193 (1954), at least if the employ-

ees are acting on behalf of the corporation and not as individuals for their individual advantage. *See* 15A C.J.S. *Conspiracy* § 2 at 600.

■ There is evidence that Larson and Fitzsimmons were not acting in good faith on behalf of the corporation in their dealings with Pittman. The evidence strongly suggests that the reason Pittman's contract was changed was not for a bona fide business purpose, but rather because Larson was irritated that one of his employees was earning more than he did as owner of the company. This conclusion is supported by the circumstantial evidence that when Pittman's accounts were given to other salesmen, those salesmen received a 17% commission. A jury might reasonably have concluded that the real purpose behind the changes in Pittman's contract was to "put him in his place" relative to Larson, and not to serve a legitimate corporate objective. Hence, Pittman made a prima facie case of the existence of two or more persons in addition to the corporation sufficient to withstand a motion for directed verdict. Furthermore, there is evidence of conspiratorial conduct between Larson and Fitzsimmons in their individual capacities.

The judgment is affirmed insofar as it relates to statutory fraud and reversed in all other respects, and the cause is remanded for a new trial.

PIERCE and BABCOCK, JJ., concur.